## 10827

### STATE v. BIGHAM

#### (112 S. E. 332)

1. **HOMICIDE—CIRCUMSTANTIAL EVIDENCE HELD TO SUSTAIN CONVICTION FOR MURDER IN THE FIRST DEGREE.**—In a prosecution for killing defendant's brother, evidence of trouble between defendant and the other members of his family, of defendant's presence in the vicinity when the brother and his mother and two sisters and two adopted children of one sister were killed, and the subsequent presentation for record by defendant of a deed executed by some of the decedents conveying property in which the grantee's name had been altered, *held* to sustain a conviction for murder in the first degree, notwithstanding defendant's claim that the brother killed the other members of the family and then killed himself.

2. **CRIMINAL LAW—MOTION FOR CHANGE OF VENUE BECAUSE OF PREJUDICE AGAINST ACCUSED IS ADDRESSED TO TRIAL COURT'S DISCRETION.**—A motion for change of venue because of prejudice in the county against accused is addressed to the trial Judge, and the denial thereof does not require reversal of the conviction, in the absence of a showing that such discretion was erroneously exercised.

3. **CRIMINAL LAW—DENIAL OF CONTINUANCE FOR PREPARATION OF DEFENSE IS WITHIN COURT'S DISCRETION.**—A motion by accused for a continuance to enable him to prepare his defense is addressed to the discretion of the trial Judge, and exceptions to his denial thereof cannot be sustained in the absence of a showing it was erroneously exercised.

4. **CRIMINAL LAW—WHERE QUESTION IS PROPER, MOTION TO STRIKE ANSWER IS NECESSARY.**—Where the question propounded to the witness was not objectionable, motion should be made to strike out the answer.

---

Authorities discussing the question of "malice aforethought" in the definition of murder—what the term now means, and how the courts should deal with it in charging the jury, are collated in a note in 38 L. R. A. (N. S.) 1054.

5. CRIMINAL LAW—GROUND OF OBJECTION TO QUESTION MUST BE STAT-
ED.—An exception to the overruling of an objection to a question
asked a witness cannot be sustained where no ground of objec-
tion was stated.

6. CRIMINAL LAW—REQUESTED INSTRUCTION ON PRESUMPTION OF INNO-
CENCE COVERED BY GENERAL CHARGE NEED NOT BE GIVEN.—A re-
quest to charge that defendant was, at the beginning of the case,
innocent, and so continued, unless the jury believed the evidence
established his guilt beyond all reasonable doubt, merely stated
in another form the well-settled doctrine of presumption of inno-
cence, and exception to its refusal cannot be sustained · where
the Judge had given the defendant the benefit of that proposition
in his general charge.

7. CRIMINAL LAW—REQUESTED CHARGE ON PRESUMPTION OF INNO-
CENCE HELD CONFUSING.—A requested charge that defendant "is,
as a matter of law, at the beginning of the case as innocent of
the crime charged against him as any member of the jury, and
continues so to be until this moment, unless the jury believes
the evidence establishes his guilt beyond a reasonable doubt," was
confusing and calculated to mislead the jury.

8. CRIMINAL LAW—CHARGE DEFINING "EXPRESS MALICE" HELD NOT
MISLEADING WHEN CONSIDERED AS A WHOLE.—A charge that malice,
express or implied, must be aforethought to establish murder in
the first degree, but that it need not have existed for any great
length of time, but may be conceievd or may be implied by the
character of the conduct in a moment of time, so that "if a
killing is shown to have been done, if, as in this case, defendant
is shown beyond a reasonable doubt" to have · killed · decedent
with malice aforethought, express or implied, he is guilty of mur-
der, was not misleading, when considered with the charge in
its entirety.

9. CRIMINAL LAW—REMARK OF COURT TO DEFENDANT'S ATTORNEY HELD
NOT PREJUDICIAL.—A remark by the Court to defendant's Attor-
ney, after the latter had engaged in a colloquy with the solicitor,
to the effect that, if defendant's attorney could not conduct his
argument in a more orderly manner, the Court would require
him to take his seat and appoint other counsel to conduct the
case for defendant, did not prejudicially affect the rights of
defendant.

Before MEMMINGER, J., Florence, Spring term, 1921.
Affirmed.

Edmund D. Bigham indicted for the murder of L.
Smiley Bigham and upon conviction appeals.

24 S. C.—119

The exceptions of defendant were as follows:

(1) That the presiding Judge erred in overruling appellant's motion for a change of venue, in that the affidavits submitted by the accused in support of said motion plainly and manifestly showed that the accused could not at the time he was called to trial secure a fair and impartial trial of his cause in the said County of Florence.

(2) That the presiding Judge erred in overruling appellant's motion for a change of venue, in that the affidavits submitted by the State were not sufficient in legal form, statement, or effect—the said affidavits not stating facts or grounds upon which the alleged beliefs and opinions of affiants were founded—to sustain the conclusion of the presiding Judge that the defendant could obtain a fair and impartial trial in Florence County, and in so holding he was plainly and manifestly in error.

(3) That the presiding Judge erred in overruling the appellant's motion for a change of venue, in that upon the whole showing made, upon said motion, he did deprive the defendant, as a citizen of this State and of the United States, of his right to a fair and impartial trial, as guaranteed to him under Article 1, § 18, and Article 6, § 2, of the Constitution of South Carolina, and Section 3832 of the Civil Code of South Carolina.

(4) That the presiding Judge erred in overruling the appellant's motion for a change of venue, in that, by his refusal to grant such motion and order the place of trial changed to some other county within the same judicial circuit, he did fail to exercise a sound judicial discretion, and was plainly and manifestly in error.

(5) That the presiding Judge erred and did fail to exercise a sound judicial discretion in overruling defendant's motions for a continuance, in that he thereby deprived appellant of a reasonable time within which to prepare his defense.

(6) That the presiding Judge erred and did fail to exercise a sound judicial discretion in overruling defendant's motions for a continuance, in that he thereby deprived him of his right to be fully heard in his defense, in contravention of the provisions of Article 1, § 18, of the Constitution of South Carolina.

(7) That the presiding Judge erred and did fail to exercise a sound judicial discretion in overruling defendant's motions for a continuance, in that he was thereby deprived of the privilege of using the testimony taken at the Coroner's inquest to contradict the witnesses for the State, Dr. W. H. Poston and others.

(8) That the presiding Judge erred in admitting, over the objection of appellant's counsel, the testimony of the witness, Mrs. Kirton, as to an alleged conversation between herself and the deceased, Smiley Bigham, the appellant not being present; such testimony being as follows:

"Q. You saw him Tuesday before the homicide? A. Yes, sir.

"Q. Were his actions normal that day; did he have a conversation with you? A. Yes, sir.

"Q. What was the conversation? (Objected to by defendant. Objection overruled. Exception noted.) A. He said: 'He is kind of cutting up some with us; he has had his share, but I am going to give him a piece of land if he will behave himself. He is talking about killing us all, but I am not afraid.' "

Said testimony being hearsay and highly prejudicial to the rights of accused.

(9) That the presiding Judge erred in refusing to charge appellant's first request to charge, to wit: "That the defendant was, as matter of law, at the beginning of this case, as innocent of the crime charged against him as any member of the jury, and that he continues so to be until this moment, unless the jury believe that the unimpeached

evidence presented from the stand establishes his guilt beyond all reasonable doubt." It being respectfully submitted that the said request embodied a correct principle of law which was applicable to the case.

(10) That the presiding Judge erred in refusing to declare the law, as required of him by Article 5, § 26, of the Constitution of South Carolina, in that he failed to charge the jury that the accused then on trial was presumed to be innocent, which presumption remained with him at every stage of the trial, and entitled him to an acquittal, until removed by evidence adduced at the trial sufficient to convince the jury beyond a reasonable doubt of his guilt, which is a correct principle of law and was directly applicable to the case.

(11) That the presiding Judge erred in refusing to declare the law as required of him by Article 5, § 26, of the Constitution of the State, in that he failed to charge the law relating to the defense of an alibi, the issues involved therein fairly arising upon the record in the case and the law relating thereto being applicable to the case.

(12) That the presiding Judge erred in charging the jury as follows, to wit: "Now that malice, either express or implied, must be aforethought to come up to the requirements of the law. It does not mean that that aforethought must necessarily have existed for a great length of time. That is not necessary to make malice aforethought. It may be conceived in the man's mind, or it may be implied by the character of the conduct described to you in a moment of time. So that if a killing is shown to have been done, if, as in this case, the defendant is shown, beyond a reasonable doubt, to have killed Smiley Bigham with malice afterthought, express or implied, he is guilty of murder; otherwise not." In that by the use of the words, "if, as in this case," he virtually instructed the jury to find the defendant guilty of murder.

(13) That the presiding Judge erred in charging the jury as follows, to wit: "Now, that malice, either express or implied, must be aforethought to come up to the requirements of the law. It does not mean that the aforethought must necessarily have existed for a great length of time. That is not necessary to make malice aforethought. It may be conceived in the man's mind, or it may be implied by the character of conduct described to you in a moment of time. So that if a killing is shown to have. been done, if, as in this case, the defendant is shown, beyond a reasonable doubt, to have killed Smiley Bigham with malice aforethought, express or implied, he is guilty of murder; otherwise not"—in referring to and charging upon the disputed facts in the case, namely, that the appellant killed the deceased with malice aforethought, or that he killed him at all.

(14) That the presiding Judge erred in charging the jury as follows: "Now, the defendant claims in this case not only that he is not guilty of the offense, but that the death of Smiley Bigham was the result of an act of his own; that he committed suicide. Now, is there a reasonable doubt upon that point? If you find that there is a reasonable doubt that Smiley Bigham killed himself—took his own life—then you cannot convict the defendant in this case, because it must be shown beyond a reasonable doubt that Smiley Bigham did not commit suicide and that this defendant did kill him, before you can bring in a verdict against him." In that he thereby, in effect, told the jury that it was incumbent upon the defendant to explain the death of Smiley Bigham, beyond a reasonable doubt; otherwise, he must be convicted.

(15) That the presiding Judge erred in charging the jury: "Now, the defendant claims in this case, not only that he is not guilty of the offense, but that the death of Smiley Bigham was the result of an act of his own; that

he committed suicide. Now, is there a reasonable doubt upon that point? If you find that there is a reasonable doubt that Smiley Bigham killed himself—took his own life—then you cannot convict the defendant in this case, because it must be shown beyond a reasonable doubt that Smiley Bigham did not commit suicide and that this defendant did kill him, before you can bring in a verdict against him." In that, by using the language, to wit, "Now, the defendant claims in this case, not only that he is not guilty of the offense, but that the death of Smiley Bigham was the result of an act of his own; that he com· mitted suicide," he deprived the appellant of the right to rest his case wholly upon his plea of not guilty, and imposed upon him the burden of otherwise accounting for the death of the deceased.

(16) That the presiding Judge erred in charging the jury: "Now, the defendant claims in this case, not only that he is not guilty of the offense, but that the death of Smiley Bigham was the result of an act of his own; that he committed suicide. Now, is there a reasonable doubt upon that point? If you find that there is a reasonable doubt that Smiley Bigham killed himself—took his own life—then you cannot convict the defendant in this case, because it must be shown beyond a reasonable doubt that Smiley Bigham did not commit suicide and that this defendant did kill him before you can bring in a verdict against him." In that he virtually instructed the jury unless the appellant did show that Smiley Bigham did commit suicide beyond a reasonable doubt, they might conclude that the appellant killed him.

(17) That the presiding Judge erred in stating to counsel for accused: "If Mr. King cannot conduct his argument in a more orderly manner, the Court will require him to forthwith take his seat, and other counsel will be appointed to conduct the case for defendant." In that the language of counsel to which the presiding ·Judge

referred was a fair, proper, and legitimate discussion of the evidence adduced in said cause, and such remark from the Court directed to counsel in the presence of the jury was highly prejudicial to the rights of appellant.

(18)   That the presiding Judge erred in stating to counsel for appellant as in Exception 17: "If Mr. King cannot conduct his argument in a more orderly manner, the Court will require him to forthwith take his seat, and other counsel will be appointed to conduct the case for defendant." In that such statement by the presiding Judge in effect denied to appellant the right to be fully heard in the presentation of his case to the jury, in contravention of Article 1, § 18, of the Constitution of South Carolina; the language of counsel to which the statement of the presiding Judge was directed being a fair, proper, and legitimate discussion of the evidence adduced in said cause.

(19)   That the verdict of guilty found against appellant was not supported by any legal, relevant, and competent evidence in said case.

(20)   That the presiding Judge erred and failed to exercise a sound judicial discretion in overruling the motion of appellant for a new trial, in that the verdict of guilty found against the appellant was not supported by any legal, relevant, and competent evidence in said case.

(21)   That the presiding Judge erred and failed to exercise a sound judicial discretion in overruling the motion of appellant for a new trial, in that the verdict was not supported by any evidence in the case.

(22)   That the presiding Judge erred and failed to exercise a sound judicial discretion in overruling the motion of appellant for a new trial, in that he was denied the right to a fair and impartial trial as guaranteed to him by the Constitution of South Carolina, both in failing to grant his motion for change of venue and for continuance.

(23) That the presiding Judge erred and failed to exercise a sound judicial discretion in overruling the motion of appellant for a new trial, in that the verdict of "guilty" dence and law of the case.

(24) That the presiding Judge erred and failed to exercise sound judicial discretion in overruling the motion of appellant for a new trial, in that the verdict of "guilty" and sentence pronounced thereon are not supported by any legal, competent evidence in the case.

(25) That the presiding Judge erred and failed to exercise a sound judicial discretion in overruling the motion of appellant for a new trial, in that the verdict and sentence thereon are not supported by any evidence whatsoever.

*Mr. A. L. King,* for appellant, cites: *Refusal of change of venue denied defendant a fair trial:* 86 S. C., 422; 110 S. C., 273; 5 Ky. L. Rep., 877; 84 Ala., 410; 16 C. J., 216; Id., 353; 91 S. C., 29; 1 Bish. Crim. Proc., Sec. 1092; 56 N. W., 257. *Continuance on ground of inadequate time for counsel to prepare case:* 23 So., 503; 127 Pac., 746. *Testimony before Coroner had not been signed by witnesses:* Crim. Code 1912, Sec. 1010; 1 Civ. Code 1912, Sec. 1288. *Presumption of innocence to end of trial:* 1 Bish. Crim. Proc., Sec. 1105; 16 C. J., 535; 79 S. E., 87; 156 U. S., 432. *Charge on facts:* 85 S. C., 270; 98 S. C., 300; 82 S. C., 486. *Remarks to defendant's counsel prejudicial:* 99 Miss., 47.

*Mr. L. M. Gasque, Solicitor,* for respondent, cites: *Change of venue discretionary:* 110 S. C., 273. *As is continuance:* 79 S. C., 84; 77 S. C., 236. *If covered by general charge it is not error to refuse a specific request:* 84 S. C., 568; 84 S. C., 416; 95 S. C., 239. *Alibi:* 100 S. C., 435. *Counsel must call Court's attention to obvious omission:* 81 S. C., 1. *Charge on malice:* 86 S. C., 106. *Charge must be taken as a whole:* 98 S. C., 262; 99 S. C.,

432; 98 S. C., 338. *Charge on facts*: 86 S. C., 81. *Argument controlled by trial Judge.* 26 S. C., 118.

January 26, 1922.

The opinion of the Court was delivered by MR. CHIEF JUSTICE GARY.

The defendant was indicted, severally, for the murder of his mother, Mrs. Smiley Bigham; his sister, Mrs. Margery Black; his brother, L. Smiley Bigham; and two adopted children of Mrs. Black.

True bills were returned on all of the indictments; and the Solicitor elected to try him, first, under the indictment charging him with the murder of his brother, L. Smiley Bigham.

The defendant entered the plea of not guilty.

The jury rendered a verdict of guilty, whereupon the sentence of death was imposed upon him, and the 8th of April was fixed as the day of execution.

The defendant appealed upon numerous exceptions, which will be reported.

This is an extraordinary case; the testimony is very voluminous; four days were consumed in its trial.

The evidence is circumstantial. There are two theories in the case. The first is that the defendant killed the five parties whose names are mentioned in the indictments. The second is that Smiley Bigham killed four of the parties—his mother, sister, and the two boys—and then committed suicide.

Some time between the hours of 3 and 4 o'clock during the afternoon of January 15, 1921, Mrs. M. M. Bigham was found in a dying condition in her back yard, with a bullet hole in the left side of her neck, and another just behind the lower left ear; and expired almost immediately. About the same time the body of Mrs. Margery Black was lying dead in her room upstairs, with a bullet hole in

front of her left ear. About the same time John Mc-Cracken, one of the adopted boys, was found dead on the back porch, with a bullet in his head. Leo McCracken, the other adopted boy, was found fatally wounded on a pile of straw about fifty yards from the rear of the house; one bullet hole was in the wrist, and another in the head. He survived, though unconscious, until the following morning. Smiley Bigham was found dead in the woods next morning, about 425 yards from the Bigham home, with a bullet hole in his head, and a pistol in his hand. The defendant, his wife, and his two daughters, together with the five persons who were killed resided at the Bigham home.

There can be no doubt that whoever committed the murders was actuated by a deep-seated motive, which was not robbery nor malice altogether, as there could have been none against the two little boys. The uncontradicted testimony shows that there was trouble in the Bigham family arising out of financial relations. We shall therefore attempt, in the first instance, to show what those relations were.

P. H. Arrowsmith, Esq., a witness for the State, testified substantially as follows:

"I was employed by the Bigham family, Mrs. Bigham, Mrs. Black, and Smiley, ever since the death of Mrs. Cain. Mrs. Cain was a deceased sister. I represented them until the death of these parties—about nine months. During that time I saw them frequently indeed. They would come to my office. The attitude of the son, daughter, and mother towards each other, was unusually considerate and affectionate, at all times when they were in my office. Practically every time they came they came together.

"The will that was introduced was drawn in my office and written by me. Prior to that time they had been at my office and had legal work done. After that time Ed-

mund Bigham came to me. He came in my office and made himself known to me. I never had seen him before. He professed a desire to discuss the land case wtih me. I went over it quite in detail with him. He started at the death of his father; upon his death the descent of the property, one-third to the mother and the remaining two-thirds equally among the five children, Mrs. Black, Mrs. Cain, Edmund, Cleveland, and Smiley. We discussed the sale of Edmund's interest in 1908 to his mother and brother Smiley. (The original deed, I have it here and had it at that time.) We discussed the sale of Cleveland's interest in connection with the bond question, so that the property was left at that time owned by Mrs. Bigham, Smiley, Mrs. Black, and Mrs. Cain. We discussed the transaction which had resulted in the getting of a bond by Cleveland pending his appeal after conviction. We discussed the fact of Cleveland's being a fugitive from justice, and the transaction as to the land brought about by reason thereof, to the effect that the title to all the property, with the exception possibly of some lots in Pamplico, which had not been included, had been made to Mrs. Cain, so that, she not being one of the sureties under the bond, the State would not be enabled to collect the judgment that had been rendered upon the bond upon his default. Upon Mrs. Cain's death, two deeds had been recorded in the office of the Clerk of Court. About that time it became known that Messrs. Whiting & Baker had been employed by Mrs. Cain to contend for a greater interest in the property than otherwise she would have been entitled to, except for these deeds. Conceding that a fraudulent or voluntary conveyance was good between the parties, I arranged through the First National Bank of Florence by a mortgage of the property for that bank to issue its certificates of deposit for an amount sufficient to pay the State of South Carolina the

judgment, which had been rendered on the bond which had been estreated upon default of Dr. Bigham in 1910. This mortgage is duly recorded and the certificate of deposit is in the hands of Solicitor Gasque. It was my purpose to bring suit and sell all of the land so that Bogan Cain and his children would receive only a two-fifteenths part, and the balance would be owned by the other, Mrs. Black and Smiley. This was fully explained to Edmund in my conversation with him. He appeared at that time to be most anxious that some settlement of the matter be made out of Court, and asked my permission to talk to Bogan Cain, to which I gave my consent. Some time after that I had a conversation with Mrs. Bigham, Smiley, and Mrs. Black, and as a consequence of that conversation on Edmund's next visit to me I told him that I was too busy to discuss the matter with him, that I had already gone over it with him, and that I was not in position to discuss it with him any further.

"I did not at that time prepare any deeds for those parties.

"Q. Did you know whether they had signed a deed to Smiley? A. Only by hearsay.

"Q. Is there anything else you know about it? A. I know a great deal that I am not allowed to state.

"Q. What was the attitude of Mrs. Black the night she came to you to prepare that will? A. Greatly agitated. Her brother, Smiley, was with her.

"Cross-examination:

"Q. You state that you had in your files all of the papers and records of the Bigham property? A. I have them here.

"Q. You stated that at that time you had all the records when you prepared the will? A. Yes.

"Q. To whom was the will delivered after its preparation? A. Delivered to Smiley.

"Q. I believe you occupy the position of County Attorney? A. ·I do.

"Q. Do you know anything with reference to the mutilation of the records in this county here? A. There were certain deeds torn out, and I only know this, that it was rumored that Smiley had destroyed the records; and the grand jury, knowing that I was Smiley's attorney, and that I was County Attorney, asked me to come before them, in connection with that matter, in the dual capacity of Smiley's attorney and the County Attorney, and give them such information as I had. I stated to the grand jury that I had the original deeds and had no knowledge of the mutilation of the records and that Smiley had denied doing it; and no action was taken against Smiley as the result of my appearing before them. Members of the grand jury called at my office and inspected the original deeds, the record of which had been destroyed."

E. M. Singletary, Clerk of Court, thus testified:

"I know Edmund Bigham. I never knew his wife. Shortly after this homicide his wife appeared at my office. She brought a deed in there and left it for record. I did not record it. When she first gave it to me to record, she asked about how soon I could have it recorded. I told her in an hour's time. At a glance I took it to be a mortgage; I thought it was a mortgage of real estate. She said she would call for it; and after she retired I took it up to see what it was, and noticed it was a deed; and then I noticed the consideration and that there were no revenue stamps on the paper. I noticed the consideration, and that is the reason I didn't record it. I thought I would hold it until she came and advise her as to the necessity of having revenue stamps on it. At that time there was nothing said about revenue stamps. She came back in about 40 minutes afterwards. Then I informed her about the revenue

stamps.  I gave the deed to her at her request.  I have not
seen it since.  I do not know where it is. * * *

"That deed conveyed four different tracts of land, several
lots of land in Pamplico, including about 900 acres.  It was
signed by Mrs. M. M. Bigham and L. S. Bigham and Mrs.
Margery Black; they were the grantors.  In that deed E.
D. Bigham was the grantee, but it could be easily seen that
the original grantee had been erased.  The paper showed
evidence of mutilation, both as to consideration and as to
date, and also as to grantee.  The deed she produced there
to put on record the grantee's name as appearing in there
was Edmund Bigham, her husband.  Edmund Bigham was
at that time in jail.  I showed it to my clerk, Miss Lizzie
McIntyre.  I have handled a great number of deeds since
I have been Clerk.  The original grantee's name had been
erased and Edmund Bigham's name was in there—a change
of the consideration and the date.  You could see the orig-
inal consideration was changed.  I remember the notary
that subscribed his name as being Sam Rittenberg in
Charleston, and the witness as Sidney Rittenberg.  In fill-
ing out the probate, the witness was Sidney Rittenberg, and
it says that he with Sidney Rittenberg witnessed the due
execution of same.

"Cross-examination:

"The deed was typewritten.  The original date you could
see where it had been blurred, caused by a rubber and was
printed over that 1920; with a typewriter, all except the
signature.

"Certain papers were stolen out of the county records.
There was a deed made to Mrs. Cain torn out of the rec-
ord, and the reverse side of that leaf was a record of some
one else; I can't name it.  The record that was made to Mrs.
Cain was made on one side of the leaf, and on the other side
somebody else's transaction was placed on the other side.
And then the index, the cross-index, for instance from

Cain back to Bigham, was torn out; that whole batch of C.'s was torn out. It was one of those deeds you had here yesterday, which was from Mrs. Cain to Mrs. Black. They were taken out of the record somewhere between the 13th and 25th of February, 1920. I don't think Edmund Bigham was in this section of the country at that time. I hadn't seen him around.

"Q. Was Smiley Bigham in this section at that time? A. Yes, a frequent visitor in my vault where the records were kept at that time.

"Q. Are you in a position to state who tore those records out? A. No.

"Q. Smiley was a surveyor? A. Yes.

"Q. Do you know whether or not he was a frequent visitor for years in the Clerk's office? A. No, sir; but he was a frequent visitor since I have been there.

"Q. After Edmund did return to this county and just before the homicide, didn't he spend a whole lot of time in your office? A. A good deal.

"Q. I will ask you if the deed that was cut out of the record was a deed from Mrs. Black to Mrs. Cain? A. That is as well as my memory serves me.

"Q. Isn't it a fact that, a short time after you discovered that, Mrs. Black went into your office with a deed for the same property? A. Yes.

"Redirect examination:

"Q. How is that? A. He asked me if it was not a fact that Mrs. Black, pretty soon after that, if she didn't present me a deed conveying back to her property that was made to Mrs. Cain that had been torn out, and I said, 'Yes.'

"Q. After those deeds were torn out, did Smiley Bigham continue his frequent visits there? A. After those deeds were torn out, for some two or three months before, he visited that office only during the time those two deeds

were left there for record. They were brought there just after these deeds were taken out.

"Q.   In other words, he was a frequent visitor there, and then the deeds were missing; is that right?   A.   Yes.

"Q.   And then not long after that he brought a deed alleged to be a conveyance from Mrs. Cain back to Mrs. Black for record?   A.   No, Mrs. Black brought that.

"Q.   Was Smiley there when she brought them?   A. No, she was by herself.

"Q.   When did he come back?   A.   I   said   that   he came back while those deeds were lodged in my office for record, before they got them back.   There were two of those deeds, and they were not put on record for some two or three days after they were lodged, and then it was some few weeks before he came back; and after that he became what I would term a frequent visitor to that office all along ever since I have been in it.

"Q.   There was a whole lot of time, after the deeds were lodged there, before he commenced his frequent visits again?   A.   Several weeks, I think.

"Q.   Now, in reference to those deeds that were torn out of the record, I want to ask you if, from what you saw, you formed any opinion as to who the party was who stole those records?   A.   Yes.

"Q.   In your opinion, who stole them out?   A.   Smiley Bigham.

"Q.   You testified that those records were torn out about the 7th of February, 1920?   A.   No, I testified between the 15th and 25th of February."

.   Edmund D. Bigham, the defendant, thus testified:

"Q.   About the deed that was sent to the record office, tell us about that?   A.   I had it; it was given to me.

"Q.   By   whom?   A.   By   Margery,   Smiley,   and mother.

"Q.   For what?   A.   For money I   had   let   Smiley have.   Father died after I was married.   I was living in

the upper part of the State, and just about a year after I was married, father got hurt and he died from that wound. During the summer or early part of that fall, I came down there and sister Margery was administrator. We among ourselves, there was no auction at all, and anything one wanted he bid on it, and the one who bid the most for it got it. I never got anything but an iron safe, and that stayed there.

"The year after, after father's death, four or five months after the sale, I moved down and bought a place, known as the 'Exum place.' I had moved back to Greenville, and in March, 1908, I think, a year and a half after I bought this Exum place, I sold to Smiley and mother my interest in the home place; in other words, all the property that belonged to my father, except the mill right, which they did not want, I have never received a penny for my two years' interest in the home place. I had their note, a joint note, for the amount of what my part of the personal property was, which was given to me about a year and a half after I moved up to Greenville and began farming up there. Smiley got into some trouble. He was tried for murder. Mr. Ragsdale defended him, and he gave Mr. Ragsdale a mortgage of some kind. I don't know how much it was. I sold the Exum place along in the fall that Smiley was tried, and I let Smiley have the money, the amount he was owing Mr. Ragsdale. Cleveland got into some trouble in Georgetown. He was tried for murder and convicted and sentenced to serve three years. I paid Mr. Ragsdale, Cleveland's lawyer, and Cleveland gave me a mortgage over his interest in the estate to secure me for the money I let him have, to pay part of it to Mr. Ragsdale; mama paid part of it. He gave me a mortgage for that money and other little advances. That paper was renewed every two years, and signed by every one of the family. In 1918 Margery came down to South Georgia, where I was living,

and stayed there and wrote out a copy of that mortgage which I had and brought it back home. It was signed by most of the family, and some man named Brown witnessed it, and Smiley probated it, and it had his seal on it. Mama brought the paper to me, and I gave her the old paper which I had.

"Q. This is the deed you are talking about? A. No, sir; I am talking about the mortgage.

"Along in June, I got a letter from mother, she said, 'Come at once,' but didn't state what the trouble was in the letter. I came on the next train. On Monday afternoon, Smiley, mother, and Margery and myself came up here. I had not seen Bogan Cain since he married my sister, and I had a talk with him. On Monday night I went back to South Georgia. During the same week mother wrote me. and told me Smiley's condition; that it looked like it .was getting worse. Along in July I left Georgia and drove through, and drove up to Greenville and stayed there one week. Mother wrote me and told me to come down there, and I came down here. I stayed there three or four days or a week. She told me about different things that had taken place; I don't reckon you want to hear it. I stayed there about a week, and I think I went to South Georgia and stayed .there three or four weeks.

"I went back up to Greenville and got my wife and children, and a day or two after I got back from South Georgia, we drove down here and stayed a week or ten days, and drove back to Greenville. My mother did not want us to go, her or Margery either. They said, 'We want you to stay here,' and stated the reason that they were afraid, and told me about sending for Mrs. Kirton.

"Q. What time did you get the deed? A. We were all in the dining room, Margery and Smiley were in there, and they called me in. Smiley said: 'Edmund, you know my trouble.' He had already told me about

people talking about his tearing out those records. And he says: 'We will never be able to pay you what we justly owe you. You have been a mighty good brother to me; I have never asked you to do a thing for me but what you did it, if it was so you could.' He says: 'I feel towards you right now just as we did when we used to play together when we were boys; and, after we got grown, we have felt the same way.' He says: 'You have been with me in Arrowsmith's office' (which I had). 'You have talked to Bogan Cain about things I asked you to talk to him about, and you have told me what he said. And now you know the situation about as well as I do.' He says: 'What do you consider this place and things are worth.' He was sitting at the table, and he commenced putting the values on the lots at Pamplico. I told him I didn't want them. He began putting down what he thought the Kirton wood was worth. He said: 'I have talked this thing over,' and he says, 'That mortgage two years ago on the 17th of August was $26,000.00.' He says, 'The interest on that up to now, and the money you let me have in June when you came over here, amounts to so much,' and he says, 'We will be with you just as you have been with us, and we will give you a deed.' Smiley fixed up that paper; he said he did. He said Sidney Rittenberg and S. Rittenberg and some one else and Sam Rittenberg probated it in Charleston, and he gave me that, and I gave him the mortgage for $11,000.00. The difference between that $42,000.00 and the amount of that deed and the $11,000.00, was the money I let him have in June, and let him have along during the fall, to pick his cotton and other things that he wanted along during the fall, and the amount of my interest in the estate.

"Q. And that is how the deed came up? A. Yes, sir; that deed stayed in my trunk until the day I was arrested. When I came back home I went upstairs and got

that deed, and still the mortgage for $26,000.00 was not marked paid; it was just like it was when they gave it to me. I brought that deed and mortgage up here when I came. I gave my wife the deed in the jail on Friday morning, the next morning after I was placed in jail. I told her to take it and have it recorded, but I never thought of any government stamps. My wife brought me back the deed and I had it in jail. I was searched two or three times for that deed. At one time I thought Mr. Rose had found it, but if he recognized feeling it he passed it up. They went downstairs and searched the whole jail. They were hunting some letters of Mr. Arrowsmith's. I think, too, I had them. I got the letter out of the safe. I told you about it, and you asked me to get the letter. I didn't tell you where it was, but I told you I would get it for you, and you got the letter. After the Coroner's inquest, they came and searched me again. I still had the deed, and I thought Mr. Rose felt it that time, but, if he did, he passed it up. The next time my wife came up there, I gave it to her and told her to take it and take care of it. That is the last time I have seen it.

"Q. Now, if you know of your own knowledge, what was Mr. Arrowsmith to do with reference to that matter? A. It seems that there was some friction as to the interest of Mrs. Cain, my sister that died in November last.

"Q. Did she, or not, have a deed to the property, or some kind of paper on it? A. There had been deeds shifted from one to the other between different members of the family down there to get out of paying the $1,500 bond for Cleveland.

"Q. Tell what Mr. Arrowsmith was to do. Was not the deed on record in favor of Mrs. Cain? A. I don't know whether it was on record or not, but I do know those papers were made in Cartersville, written by Smiley, and probated by H. H. Harris, and witnessed by Brown

Martin. I think those are the people that witnessed it and probated that paper.

"Q. Is it not a fact, as you understand it, that Mr. Arrowsmith was employed to clear all of that up? A. Yes.

"Q. Up to the time those people were killed, was there any satisfactory settlement as far as you know? A. No, Smiley would come up here and talk to Mr. Arrowsmith, and he would scare him about those papers taken out of the Clerk's office, and so he would come home and tell me.

"Q. Why did you come home with your family in the Bigham home? A. I went there because my mother had written me and told me of Smiley's condition, and that she was afraid to stay there with him. That is the reason Margery left over at the old place; there was nobody at all with mother and Smiley, and she moved over there so as to be with her.

"Q. Tell me why Mrs. Margery Black, during the whole of the week before she was killed, said that this deed was stolen from her, and that she was fearful of her death, and in the same breath she is now speaking from the grave, said, 'I give unto my brother, Smiley, the charge of my mother, and those two little boys.' Did she do that? A. What part of that do you want me to answer?

"Q. Why your sister said that, if there was no trouble between you and your sister? A. I have got my doubts about her saying it. I don't believe she said it. I have seen that in the paper that said it was in the will.

"Q. It was in the will which was read here. A. I didn't see it that way. I have seen it before her death, and didn't see it that way.

"Q. Now, Mr. Bigham, a copy of the will that your attorney handed me is certified to by Mr. Brunson. Your sister said: (The Solicitor read the will.) That is what she said. Now, I want to ask you this: If there was no

trouble with her, with some one down there about that land, why would she incorporate it in her solemn will? A. There is some land down there that Smiley bought from Finklea in Margery's name.

"Q. But all the land was in her name. A. It was not.

"Q. The deeds show it. It could not have been possible that Mrs. Black would have intrusted the affectionate care of her mother and those two children and all her property to L. Smiley Bigham if she was fearful of her life from L. Smiley Bigham. A. That is something I can't answer. I may tell you that there were times when Smiley got in one of those spells that they would do all he told them to do.

"Q. But the day she made the will she walked away from home to make that will without Smiley, and went to Pamplico and got Smiley and brought him here and made the will. You knew that? You knew a will was made Saturday before her death? A. I saw that will there.

"Q. Before her death? A. I saw that will, I think, Tuesday night.

"Q. After Smiley had gone over to Mrs. Kirton's and come back, you saw the will? Who showed you the will? A. Margery.

"Q. Where at? A. Right there in the dining room.

"Q. When that will was made you saw it, and you had in your trunk, at that time, this deed. A. I did.

"Q. Why did you keep that deed in your trunk while these parties were living and not have presented it for record until they were slain? A. For the same purpose that I understand a mortgage has been held and recorded since they died."

The will of Mrs. Margery Black, which was duly executed on the 8th day of January, 1921, contained the following provisions:

"I desire that all my debts be paid as soon after my death as may be expedient.

"I give, devise and bequeath all of my property, real, personal and mixed, in possession or to which I may be entitled at the time of my death, to my brother, L. S. Bigham, in fee simple.

"I hereby declare that I signed three blank deeds which were stolen from my possession and if they are presented or any of them by any person claiming any right, that the same are fraudulent and null and void. This will is made in apprehension because of the larceny of said blank deeds.

"I do hereby make my brother, L. S. Bigham, the sole executor of this will without bond, and request and instruct him to make due provision and take affectionate care of my mother during the remainder of her life time and if possible to have no partition of the property during her life that will interfere with her occupancy of the old home. I want him to take care of and educate my adopted sons, Leo and Mack Black, until they are of age."

Walter Burch testified as follows:

"I remember hearing of the killing; was at the house Saturday before the killing.

"Q. If anything was said there by Mrs. Bigham in Edmund's presence, tell it. A. When I went there, Mrs. Margery and Mrs. Bigham were at the door.

"Q. Where was Edmund? A. He was in the kitchen. He hadn't come out. He heard them talking, and he came out. They told me to go to Pamplico and get Mr. Rose.

"Q. Who told you? A. Mrs. Bigham and Mrs. Margery.

"Q. Mrs. Margery and Mrs. Bigham were talking, and Edmund came to where they were? A. He came out when they left.

"Q. What did Mrs. Bigham say to you? What did she ask you to do? A. To go to Pamplico and get Mr. Rose; that they were about to be killed. And Edmund came to the door and asked me wasn't I alive, and I said, 'Yes,' and he asked me didn't I want to live, and I said, 'Yes,' and he said if I had anything to do with it he was going to kill me; and I jumped on my horse and went home.

"Q. What was their condition? Were they laughing? A. No, they were not laughing. They were talking.

"Q. What were they talking about? A. I didn't hear anything more said.

"Q. Mrs. Bigham asked you to go to Pamplico to get Mr. Rose. Who is Mr. Rose? Is he an officer? A. He is a police.

"Q. What did Mrs. Bigham say she wanted you to get him for? A. She said she wanted him to come after him."

Charles Gordon testified as follows:

"I remember the Saturday of the killing; also, the Saturday before that, the 8th of January. I was in the woods that morning cutting wood. I was in the woods on the Saturday before the killing; went there to cut wood. They settled with me for cutting wood on Saturdays. Edmund was in the woods that morning; it was in the morning. No one came with him that morning. His oldest daughter came to him while he was in the woods. I didn't hear anything; he was a good piece from me. She told him something. When she came there, she asked me had I seen Dad out there anywhere. She went to her father. I don't know what she told him. They turned and went back to the house. He had not paid off before that time. After I finished up the cord of wood, I stopped and went to the house to see him because he hadn't paid me. I heard a mighty hollering at the house when I got there.

"Q. When you got to the house, state what you saw, and what was done, if anything. A. When I got to the

house. I sat down in front of the house on a pile of lumber while the hollering was going on in the house. I did't see the fuss. I just heard the hollering.

"Q. Who was hollering? A. Mrs. Margery Black.

"Q. Who was in the house with her? A. Mr. Edmund Bigham.

"Q. Where was Mrs. Bigham? A. Standing between the house and the smokehouse, crying, her and her two little children.

"Q. Edmund and Mrs. Margery were in the house? A. Yes.

"Q. Mrs. Margery was hollering? A. Yes.

"Q. What happened after that? A. Then very shortly after she quit hollering and she came running out of the house.

"Q. When she came out of the house, did you see Edmund come out of the house? A. Yes.

"Q. Right behind her? A. Yes, he came on the road and got in his car and drove to Pamplico."

Herbert Foxworth testified as follows:

"I remember the day of the killing. I was at the house the Saturday before that. When I was coming up from home, and when I got up the hill there, Mrs. Margery was washing her face on the back piazza, and Edmund was standing there sort of sideways with a piece of board about four feet long, and sort of drawn back. I went on the lumber pile and sat down.

"Q. What did you hear in the house? A. Hollering.

"Q. Who was hollering? A. Mrs. Margery; and in about 20 minutes, Mrs. Margery came out of the house running and went on down the road.

"Q. Who came out of the house behind her? A. Mr. Edmund.

"Q. What did he do? A. He came out there and asked me did I want to go to Pamplico, and him and me

got in the car and went to Pamplico. We passed Mrs. Margery on the road, most to the house where Mrs. Copeland lives. Edmund did not say anything to her when he passed.

"Q. Where was Mrs. Bigham at that time? A. She was on behind, coming; she was walking. The two little boys were with her.

"Q. Who was at the lumber pile when he came out on the lumber pile? A. Me and Charlie Gordon and Walter Miller.

"Q. Where was Mrs. Bigham when you heard the crying or hollering in the house? A. She was standing between the smokehouse and the kitchen.

"Q. What was she doing? A. Crying.

"Q. Who was with her? A. The two little boys.

"Q. At that time she was out at the smokehouse crying, with the two little boys? A. Yes.

"Q. And in the house? A. Was hollering.

"Q. And after the hollering Mrs. Black came out? A. Yes.

"Q. What was her appearance when she came out? How did she look? A. Looked like she had been crying, but had stopped then. She came out the front door and started right down the road.

"Q. Who followed her? A. Edmund came out of the house.

"Q. Out of the same door? A. Yes.

"Q. He didn't go down the road? A. Yes, he went down to where his car was.

"Q. He asked you if you wanted to go to Pamplico? A. Yes.

"Q. And you passed Mrs. Margery on the road? A. Yes.

"Q. And he didn't say anything to her? A. No."

We come now to the last chapter of this tragedy, to wit,

the facts surrounding the murders on the day they were committed. What has already been shown by the testimony renders it unnecessary that they should be stated in detail.

On the 15th day of January, 1921, the defendant went to the woods where the hands were cutting wood, about a mile from the Bigham home, after breakfast; and shortly thereafter Smiley Bigham arrived accompanied by Andrew Singletary, a trusted servant, whom Smiley's mother had requested to go with him on account of the fear that he would be killed. The defendant and Smiley were in the woods after all the hands had left. The defendant testified that he and Smiley both went home; but no one except the defendant, his wife, and daughter testified that they saw him. Other witnesses, testified, however, that they saw and recognized the defendant when he came out of the woods (which were about 50 yards from the house), about an hour before the murders. The defendant went directly to the house and there remained until he, his wife, and his two daughters went to the home of one of the employees to give him some instructions about the hauling of the wood. The defendant testified that he and his family returned home in 15 or 20 minutes, and were the first to discover the condition of his mother. The defendant, his wife, and daughter testified that they saw Smiley going into the woods, but could not tell whether he had a pistol in his hand; and that his mother said to him, when he went to her assistance, that Smiley had killed her, and expired as soon as they carried her to the house from the walkway in front of the house. When Smiley was found dead next day in the woods about 425 yards from the house, the pistol which he was grasping in his hand belonged to the defendant, who also owned another pistol of similar size and make. Both his mother and Mrs. Black, likewise, owned pistols. The nineteenth,

twentieth, twenty-first, twenty-second, twenty-third, twenty-fourth, and twenty-fifth exceptions, therefore, are overruled.

First, second, third, and fourth exceptions: The questions raised by these exceptions were addressed to the discretion of his Honor, the presiding Judge; and the appellant's attorneys have failed to satisfy this Court that it was erroneously exercised.

Fifth, sixth, and seventh exceptions: For the reason just stated, these exceptions cannot be sustained.

Eighth exception: The question propounded to the witness was not objectionable. Therefore the defendant's counsel should have made a motion to strike out the answer of the witness, if he regarded it as inadmissible, and not responsive to the ruling of his Honor, the presiding Judge. A similar question arose in the case of *State v. Mills*, 79 S. C. 187, 60 S. E. 664, in which the Court thus ruled:

"When this objection was made there was nothing to show that the transaction inquired about was not one tending to affect the credibility of the witness. The circuit Judge was not in error therefore in admitting the question. Had the objection been made or renewed when it subsequently appeared the transaction did not tend to affect the credibility of the witness, it would have been error to allow the examination to continue. * * * But the objection was not made at that time, and must, therefore, be considered waived."

This language was quoted with approval in *State v. Bing,* 115 S. C. 506, 106 S. E. 573. There is another reason why this exception cannot be sustained: No ground of objection was stated.

Ninth exception: The request merely stated in another form the well-settled doctrine that a person charged with crime is entitled to the presumption of innocence until the testimony shows that he is guilty. His Honor, the presiding Judge, gave the defendant the benefit of this proposition in his general charge. Besides, the request was confusing and calculated to mislead the jury by reason of its phraseology.

Tenth exception: What has already been said shows that this exception cannot be sustained.

Eleventh exception: In the first place, his Honor, the presiding Judge, did not refuse to declare the law as to alibi, and, in the second place, the general charge gave the defendant the benefit of the proposition that the defendant could not be found guilty of the crime alleged, if he was somewhere else when it was committed.

Twelfth and thirteenth exceptions: When the charge is considered in its entirety, there is no reasonable ground, whatever, for supposing that the jury was thereby misled.

Fourteenth, fifteenth, and sixteenth exceptions: What has already been said disposes of these exceptions.

Seventeenth and eighteenth exceptions: The following statement appears in the record:

"During the argument, the following colloquy occurred between Mr. King, leading counsel for the defense, and the presiding Judge:

"Counsel was commenting upon the fact that the solicitor seemed to be very excited when the witness A. H. Haines, who was put up by the defense, testified to facts which seemed favorable to the defendant's side of the case, in that he (solicitor) had undertaken to show that said witness was prejudiced in favor of said defendant, and then counsel for the defendant remarked that it did not seem to him that it came with good grace for the Solicitor

to raise any question of prejudice, or biased testimony, because it was certainly true that the defense had not put up any witness, who, apparently, had a $5,000 fee hanging in the balance, at which point the solicitor interrupted counsel and undertook to defend the position of the witness, P. H. Arrowsmith, against whom the remark of counsel for the defendant was directed, whereupon counsel for the defendant turned and said to the Solicitor: The time for quibbling has passed: Let's cut out the monkey talk, and get down to brass tacks,' whereupon the Court said: '*If Mr. King cannot conduct his argument in a more orderly manner, the Court will require him to forthwith take his seat, and other counsel will be appointed to conduct the case for defendant.*' "

There is no reasonable ground for supposing that the rights of the defendant were prejudicially affected by the ruling of his Honor, the presiding Judge.

It is the judgment of this Court that the judgment of the Circuit Court be affirmed, and that the case be remanded to that Court for the purpose of having another day assigned for carrying into execution the sentence imposed upon the defendant.

JUSTICES COTHRAN and FRASER concur.

MR. JUSTICE WATTS did not participate on account of sickness.

MR. JUSTICE FRASER: I concur with the Chief Justice in confirming the conviction.

I.   I think the refusal of the motion to change the venue was proper. Florence is in the Twelfth circuit. One of the reasons for the change of venue is that Dr. Bigham, a brother of the defendant, had been convicted in Georgetown county of killing his wife, and is now a fugitive from justice, and that the odium of his brother's conduct attached to the defendant in Florence county. Georgetown and Florence are in the same circuit, and no reason is stated

for concluding that the same prejudice does not extend to Marion or Horry counties, the only other counties in that circuit. So far as this point is concerned, a change would not have helped the defendant.

Again, another ground for the motion was that another brother, Smiley Bigham, had been tried for murder in Florence county; that, while Smiley was acquitted, the murder was of a "peculiarly revolting nature" and great prejudice existed on account of it, notwithstanding the verdict of acquittal. There was a further showing that Smiley was threatened with prosecution for mutilation of the public records of Florence county; that prejudice existed against the defendant on account of the crimes of Smiley. The defendant was charged with killing Smiley. The defendant's defense was that the other killings were done not by himself, but by Smiley. The defendant said Smiley did all the killing and there was a conviction on the minds of the jury that Smiley was fully capable of doing murder. The refusal of the motion to change the venue was not only an abuse of discretion, but a wise exercise of it. By the trial in Florence county the defendant got the advantage of the prejudice against Smiley.

II. As to the motion for continuance, one of the attorneys for the defendant said he had spent 30 days or more on the case. The case shows no demand for the testimony taken before the coroner, or any effort to get it. There was no error here.

III. The following charge is complained of:

"So that if a killing is shown to have been done, if, as in this case, the defendant is shown, beyond a reasonable doubt, to have killed Smiley Bigham with malice aforethought, expressed or implied, he is guilty of murder; otherwise not."

The appellant complains that the words "as in this case" makes the charge a charge on the facts. This is untenable.

The charge means (after stating the general rule), if the defendant killed Smiley Bigham with malice aforethought, he is guilty of murder; otherwise, he is not guilty. The charge was entirely proper.

IV. The next assignment of error is in this charge:

"Now, the defendant claims in this case, not only that he is not guilty of this offense, but that the death of Smiley Bigham was the result of an act of his own; that he committed suicide. Now, is there a reasonable doubt upon that point? If you find that there is a reasonable doubt as to whether Smiley Bigham killed himself—took his own life —then you cannot convict this defendant in this case, because it must be shown beyond a reasonable doubt that Smiley Bigham did not commit suicide and that this defendant did kill him, before you can bring in a verdict against him."

While this portion is somewhat involved, it is not lacking in clearness. It means, if the evidence raises a reasonable doubt as to suicide, acquit the defendant, because it must be proved beyond a reasonable doubt that the defendant killed him. That is the law of the case. There is nothing in this to throw the burden on the defendant.

The following paragraphs made it still clearer.

V. As to the statements made by the deceased:

A witness was permitted to say the deceased said:

"He is kind of cutting up some with us; he has had his share, but I am going to give him a piece of the land if he will behave himself. He is talking about killing us all, but I am not afraid of him."

Ordinarily that is incompetent, clearly so. Much depends on the surroundings. The theory of the defendant was that Smiley was a crazy man. The only way ordinary people can judge of a man's sanity is from what he says and does. The defendant, on the cross-examination, had been allowed to prove Smiley's actings

and sayings, and I cannot say it was reversible error to allow the state to follow the defendant's lead on the re-direct examination.

VI. The most serious question in the case is that the presiding Judge did not, in so many words, charge the jury that the defendant was clothed with a presumption of in-nocence. I think, however, that the omission was cured for all effective purposes when he did charge:

"Now the whole case, as you have heard it argued, is upon the basis of circumstantial evidence. You must be able to say, in order to bring in a verdict of guilty, not only may this be the man that did the killing of Smiley Bigham; not only is it possible that he might have done it; but you must be able to point to him and say, 'Thou art the man, beyond a reasonable doubt.' This is all the law requires. It is to show beyond a reasonable doubt that this defendant is the one that killed Smiley Bigham."

VII. As to the remarks of the Judge to appellant's counsel, I would say the language used by the attorney was not Court language. I can well understand how, under the circumstances, counsel might have used language such as he would not have used, would not have used or approved of, in his calmer moments. So much depends on the circumstances and the manner of saying, that it is impossible for us to condemn the remarks of the pre-siding Judge. The time to prevent a personal difficulty is at the very beginning. The presiding officer who hesi-tates is lost. He may lose control of his Court in half a minute. We cannot say therefore that his Honor com-mitted reversible error in making the statements shown by the record.

. For these reasons I concur in affirming the judgment.